**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | ) | MDL 1586 |
| ———————————————— | ) | |
| | ) | |
| MATTHEW WIGGENHORN, individually and on behalf of all others similarly situated, | ) | |
| | ) | Case No. 1:05-cv-01674-JFM |
| Plaintiff, | ) | |
| | ) | Judge J. Frederick Motz |
| v. | ) | |
| | ) | |
| AXA EQUITABLE LIFE INSURANCE COMPANY, f/k/a EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant AXA Equitable Life Insurance Company, formerly known as The Equitable Life Assurance Society of the United States ("Equitable"), submits this memorandum in support of its Rule 12(b)(6) motion to dismiss with prejudice Plaintiff's First Amended Complaint for failure to state a claim upon which relief can be granted.

**INTRODUCTION**

Plaintiff Matthew Wiggenhorn is the owner of an Equitable variable life policy. He brings this purported class action on behalf of all owners of Equitable's variable life policies and variable annuity products during an unstated period of time, seeking unspecified damages from Equitable for the harm he claims "market-timers" inflicted on some of the funds in which he and other purported class members invested. This is one of a series of virtually identical cases originally brought in the Circuit Court of Madison County against mutual fund operators and

variable annuity providers, claiming that defendants violated state law duties by failing to adopt pricing mechanisms that would have discouraged market-timing activity.

Like the defendants in the other cases, Equitable removed this case to the District Court for the Southern District of Illinois.  Plaintiff moved to remand to state court and Equitable moved to dismiss the action.  The district court did not rule on either of these motions, staying all proceedings while the Seventh Circuit was considering the same issues in the *Kircher* case.  In *Kircher v. Putnam Funds Trust*, 373 F.3d 847 (7th Cir. 2004), the Seventh Circuit concluded that such cases were properly removed under the Securities Litigation Uniform Standards Act ("SLUSA").  Several months later, the Seventh Circuit held that the same class claims asserted in this case were preempted by SLUSA and therefore directed the district court to dismiss the complaints.  *Kircher v. Putnam Funds Trust*, 403 F.3d 478 (7th Cir. 2005).

After *Kircher* was decided, the district court lifted the stay in this case and directed the parties to submit briefs on the impact of *Kircher*.  In a June 1, 2005 filing, Plaintiff conceded that his initial complaint was "not meaningfully distinguishable" from the complaints in *Kircher* and therefore would have to be dismissed.  Plaintiff argued, however, that his First Amended Complaint (the "FAC"), which was eventually filed on June 10, 2005, would cure these defects and successfully avoid the preemptive effect of SLUSA. Equitable had not yet filed its response to the FAC when the MDL Panel transferred the case to this Court.

For the reasons outlined below, the FAC should be dismissed with prejudice.[1]  Plaintiff has striven mightily to eliminate any vestige of a federal claim in the hope of avoiding SLUSA preemption.  In the process, Plaintiff has shifted 180 degrees from his original position:  while

---

[1]     The FAC in this case is virtually identical to amended complaints that have been filed against other variable annuity companies.  *See, e.g.*, *Woodbury v. Nationwide Life Ins. Co.*, and *Mehta v. AIG SunAmerica Life Assurance Co.*, which are both before this Court in No. 04-MD-15863-JFM.  Equitable adopts the arguments that the defendants in those cases have made in their respective motions to dismiss.

Plaintiff initially alleged that Equitable had failed to provide him and the purported class with "complete and truthful information" regarding the impact of Equitable's pricing policies, he now affirmatively alleges that Equitable "did *not* make an untrue statement, [or] fail to disclose any material fact in connection with Plaintiff's or class members' purchases or sales" of variable annuities or units in the annuities' subaccounts. Compare Complt. ¶ 62(e) & (f) with FAC ¶ 48 (emphasis added). Thus, Plaintiff hopes to convince the Court that he is now pursuing a pure negligence claim on behalf of a class of holders — rather than a preempted class claim under state law for damages arising out of misrepresentations or manipulative activity in connection with the purchase or sale of covered securities. Plaintiff's effort to recharacterize his claim, however, cannot obscure the fact that it is based on the alleged inaccurate pricing of covered securities (a manipulative or deceptive act) in connection with purchases and sales of those securities by market timers, which eventually caused the purported class members to suffer harm when they sold covered securities. No matter how you slice it, this is a federal claim that is preempted by SLUSA.

Plaintiff's individual claim also fails for two reasons. First, Plaintiff lacks standing to bring a claim for mismanagement of the funds held by Equitable's Separate Account. Under the terms of Equitable's contract with Plaintiff, the property in the Separate Account belongs to Equitable — not to variable annuity holders. And even if the Court were to treat Plaintiff as if he were a shareholder in the mutual fund in which the Separate Account invests, any claim for mismanagement of the fund "likely would need to be cast as a derivative action," rather than a direct action on behalf of investors. *Kircher*, 403 F.3d at 483. Plaintiff does not purport to bring a derivative claim, nor has he attempted to make the kind of showing of demand futility that would be necessary to enable him to bring a derivative action.

3

Second, even if Plaintiff had standing to bring this action, his negligence claim would still be preempted by federal law. Plaintiff's primary complaint is that the funds in which the proceeds of his variable annuity policy were invested were not properly priced, thus enabling market timers to reap excess profits, to the detriment of investors who remained in the funds. Significantly, Plaintiff does not allege that the funds used a valuation methodology that differed from what was set out in the contract he signed or the prospectus that was provided to him, nor does he claim that the methodology violated the requirements of federal law. Instead, Plaintiff contends that Equitable owed investors duties of care under state law, which required it to adopt certain pricing procedures that supposedly would have prevented market timers from making a profit at the expense of the remaining investors in the fund. But any claim that seeks to retroactively impose on Equitable a state law duty to adopt the pricing procedures outlined in the complaint is preempted by federal law. The imposition of state law standards for pricing mutual fund shares would interfere with the nationwide standards for valuing mutual funds that have been created by Congress and are implemented by the Securities and Exchange Commission ("SEC"). Indeed, it is hard to imagine a clearer case for preemption: it would be impossible to manage mutual funds if pricing could be controlled by conflicting state laws.

## PLAINTIFF'S ALLEGATIONS

Plaintiff purchased a variable life policy, the Incentive Life 2000 Flexible Premium Variable Life Policy, from Equitable. FAC ¶ 2. A copy of the policy and the Incentive Life 2000 Prospectus and Supplement dated May 1, 1994, which were supplied to Plaintiff when he purchased the policy, are attached hereto as Exs. 1 and 2 respectively.[2] That policy provided

---

[2]    In ruling on Equitable's motion to dismiss, the Court can consider the contract between the parties and the prospectus provided to Plaintiff when he purchased his variable annuity because those documents are cited and relied upon in the complaint. *See New Beckley Min. Corp. v. Internat'l Union, United Mine Workers of America*, 18 F.3d 1161, 1164 (4th Cir. 1994).

Plaintiff with both a death benefit and a variety of investment options through Equitable's "Separate Account." Ex. 1 at 6, 9.

The Separate Account is a unit investment trust, which is registered with the SEC under the Investment Company Act of 1940. Ex. 2 at 4.  Under New York law, Equitable owns the assets in the Separate Account (which are segregated and therefore not available to Equitable's creditors) and uses them to support its customers' variable annuity policies. *Id.* The Separate Account has several divisions; at the time Plaintiff purchased his policy, each of those divisions invested in a particular portfolio in the Hudson River Trust, which was a no-load mutual fund. Ex. 2 at 1. Plaintiff alleges that Equitable contracted with fund managers to manage the Trust and the assets in the various portfolios. FAC ¶ 19.

When Plaintiff or any other policyholder puts money into his or her policy account, that money is allocated (at the policyholder's direction) to a particular investment division of the Separate Account and then used to purchase "units" in that division. Ex. 2 at 10.  The investment division then purchases an equivalent number of shares in the corresponding Trust portfolio.[3] The prices at which units are purchased or redeemed when funds are moved in and out of an investment division of the Separate Account are set at the end of each trading day as of 4:00 p.m. Eastern time, according to the formula set forth in the Prospectus. Ex. 2 at 10; *see also* FAC ¶¶ 15-16.  That formula is based on the net asset value of the corresponding Trust portfolio. Ex. 2 at 10; FAC ¶ 18.  The Prospectus explains how the assets in the various Trust portfolios are valued. It states that stocks are valued "on the basis of market quotations" and that foreign securities are

---

[3]    Plaintiff alleges that the funds in the Separate Account and in the investment divisions of the Separate Account (which Plaintiff calls subaccounts), as well as the shares of the Trust, are the property of the investors, rather than of Equitable.  FAC ¶¶ 8, 10 and 12.  The Prospectus, however, made it very clear that under New York law assets in the Separate Account (including shares in the Trust's portfolios) were the property of Equitable.

"valued at representative quoted prices in the currency of the country of origin." Hudson Rover Trust Prospectus, attached to Ex. 2, at 31.

Plaintiff alleges that during the purported class period Equitable or its fund managers did not accurately price the net asset values (or NAVs) of Trust portfolios that held foreign securities. FAC ¶ 30. Plaintiff alleges that in calculating the NAVs, Equitable or its fund managers always used the last available final market price on foreign stock exchanges, without taking into account events after the foreign markets closed that might have affected the value of those foreign stocks. Plaintiff contends that the use of "stale" foreign market closing prices in calculating the NAV as of 4:00 p.m. Eastern time caused the Trust's NAV's and therefore the units in the Separate Account to be "either artificially high or artificially low" on unidentified occasions. *Id.*

Plaintiff claims that this alleged mispricing exposed him and other long-term investors to market-timing traders, who took advantage of stale pricing to make significant profits. FAC ¶ 31. According to Plaintiff, this market-timing activity diluted the interests of the remaining investors by depleting the assets in the particular subaccounts. FAC ¶ 36. Plaintiff concedes, however, that stale pricing, in and of itself, does not necessarily harm investors. Thus, he acknowledges that there is no harm if there is no trading — that is, no purchasing or selling — on a day when units are mispriced. FAC ¶ 37. And he recognizes that "holders" may be benefited on days when other investors purchase units at artificially inflated prices. *Id.*

In an effort to avoid SLUSA, Plaintiff alleges that only holders — and not other purchasers or sellers — are hurt when market-timers profit from stale pricing. FAC ¶¶ 43-47. He claims that it is the investment pool itself that is injured and claims standing to sue for mismanagement on the ground that the pool belongs to policyholders — not to Equitable. FAC ¶¶ 49-52.

As described above, in this iteration of the complaint, Plaintiff has specifically disclaimed his previous allegations that Equitable misled or failed to properly disclose the risk of market-timing to policyholders when they bought their policies and when they invested in the Separate Account.  FAC ¶¶ 41-42.  Plaintiff has also dropped his previous claims for breach of fiduciary duty and gross negligence. The only claim Plaintiff now seeks to pursue is a claim for negligence in the management of the Separate Account or the Trusts based on Equitable's (or its fund managers') adoption of pricing policies that allegedly led to stale pricing on some unidentified days and therefore created opportunities for market-timers.  As demonstrated below, Plaintiff's attempt to assert a negligence claim on behalf of a class of investors is barred by SLUSA.  And his individual claim fails as a matter of law because the claim is derivative, rather than direct, and it is preempted by federal law.[4]

## ARGUMENT

### I.   PLAINTIFF'S CLASS CLAIM IS BARRED BY SLUSA.

In 1998, Congress enacted SLUSA to prevent plaintiffs from using state law to avoid the requirements imposed by the Private Securities Litigation Reform Act of 1995. *See Kircher*, 373 F.3d at 848.  SLUSA mandates dismissal of "covered class actions,"[5] like this one, that are based on state law claims that allege deceptive or manipulative acts in connection with the purchase or

---

[4]   In accordance with the approach taken by the Court in other actions in the *Mutual Funds Litigation*, Equitable has not raised defenses to the FAC based on substantive state law. Equitable reserves the right to do so in the future.

[5]   SLUSA defines a "covered class action" as a lawsuit in which "one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties. . . . " 15 U.S.C. § 78p(f)(2)(A); 15 U.S.C. § 78bb(f)(5)(B).  Plaintiff's purported class action plainly falls within this category.

sale of "covered securities."[6]  *See* 15 U.S.C. §§ 77p(b), (c).   SLUSA provides that "[n]o covered

class action based upon the statutory or common law of any State or subdivision thereof may be

maintained in any State or Federal Court by any private party" if the complaint alleges:

> (A) a misrepresentation or omission of a material fact in connection with the
> purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or
> contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).

It is well settled that in deciding whether SLUSA preempts a purported class action, the

court is not bound by the plaintiffs' characterization of their claims. As the Fifth Circuit

explained in *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 702 (5th Cir. 2004), SLUSA

preemption "hinges on the context of the allegations — not on the label affixed to the cause of

action."  *See also Rowinski v. Salomon Smith Barney, Inc.,* 398 F.3d 294, 298 (3d Cir. 2005)

(SLUSA "creates an express exception to the well-pleaded complaint rule").  That is particularly

true in a case like this, where plaintiff's first effort admittedly was preempted by SLUSA and

plaintiff has merely dressed up his old claim in new rhetoric. *See, e.g.*, *Dudek v. Prudential Secs.,*

*Inc.*, 295 F.3d 875, 879-80 (8th Cir. 2002); *Behlen v. Merril Lynch Phoenix Investment Partners,*

*Ltd.*, 311 F.3d 1087, 1095-96 (11th Cir. 2002), *cert. denied*, 539 U.S. 927 (2003); *Araujo v. John*

*Hancock Life Ins. Co.*, 206 F.Supp.2d 377, 384-85 (E.D.N.Y. 2002) (SLUSA preempted

amended complaint even though plaintiffs had "purportedly excise[d] the allegations that the

defendant engaged in fraudulent conduct").

Here, Plaintiff has made two changes to his complaint in an attempt to avoid SLUSA

preemption.  First, he has eliminated any claim of a misrepresentation or omission of material

---

[6]      Variable annuities, as well as the units in the Separate Accounts and the shares in the
Trust, are all "covered securities." *See, e.g.*, *Lander v. Hartford Life & Annuity Ins. Co.*, 251
F.3d 101, 109 (2d Cir. 2001).

facts in connection with his own purchase or sale of the policy or units in the Separate Account. Indeed, Plaintiff has gone so far as to affirmatively allege that he and the other purported class members were *not* misled. Then, for good measure, he excludes from the proposed class any claims that any class member might have for any deceptive or manipulative device in connection with their own purchases or sales of securities; in the alternative, Plaintiff alleges that *if* Equitable is found to have made any untrue statement or omitted material facts or used a deceptive or manipulative device, then the class will be limited to those who held *before* that wrongful conduct occurred.  FAC ¶ 55. Second, Plaintiff has tried to eliminate all purchasers and sellers from the proposed class, claiming that he is suing solely on behalf of those investors who held units in Equitable's Separate Account throughout the unidentified class period.  FAC ¶ 54. For the reasons outlined below, neither of these devices is sufficient to avoid SLUSA preemption.

### A.    The Gravamen Of The FAC Is Still That Equitable Engaged In Manipulative Or Deceptive Conduct In Connection With The Purchase Or Sale Of Securities.

No matter how Plaintiff seeks to repackage his complaint, it is clear that the gravamen of the FAC is still that Equitable engaged in manipulative or deceptive conduct when it priced the shares of the Trust and the units in the Separate Account — both of which are securities.  Thus, the FAC alleges that Equitable "knew or should have known" that its pricing policies caused the those securities to be "artificially inflated" at some points in time and "artificially deflated" at others.  FAC ¶¶ 30, 67.  The claim that the prices of securities were artificially inflated necessarily includes a claim that the value of the securities was misrepresented. "The element of a misrepresentation or omission of a material fact is satisfied when a plaintiff alleges a misrepresentation concerning the value of the securities . . . sold or the consideration received in return." *Araujo v. John Hancock Life Ins. Co.*, 206 F.Supp.2d at 382 (internal quotations

omitted).  In *Araujo*, the court held that an allegation that plaintiff had been overcharged for a variable annuity policy (because a premium was charged for a period of time in which he was not insured) was a disguised misrepresentation claim and therefore preempted by SLUSA because it "concerns the value of" a security.  So too, in this case, the allegation that Equitable improperly priced a security is simply another way of saying that Equitable misrepresented the value of that security.  In addition, a claim that Equitable adopted a methodology that it knew would result in mispricing is a thinly-disguised claim that Equitable manipulated the price of a security.   Either way, the claim is a preempted claim for manipulative or deceptive conduct in connection with the purchase or sale of securities.

In addition, Plaintiff could not possibly sustain any state law tort claim against Equitable without proving that he was misled or that material information was not provided to him when he decided to purchase his policy and invest in portfolios holding foreign securities.  After all, Plaintiff entered into a contract with Equitable, which included a careful explanation as to how the various investment options worked and how units in the Separate Account would be priced. Under Illinois law, a disappointed contracting party cannot sue the other side for negligently performing its duties under the contract.  Instead, under the economic loss doctrine, Illinois law quite sensibly relegates contracting parties to their contract remedies. *See In re Chicago Flood Litig.*, 176 Ill.2d 179, 200 (1997) ("tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law . . . . offer[s] the appropriate remedy for economic loss occasioned by diminished commercial expectations not coupled with injury to person or property") (quoting *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 86 (1982)) (precluding economic loss portion of class claim for contractor's negligent supervision of pile-driving activity).

Plaintiff does not claim that Equitable breached any contractual duties it owed to him or the class. Thus, in order to show that Equitable engaged in any misconduct that could give rise to tort liability, Plaintiff would have to show that he was misled in some material way with respect to the manner in which the value of shares in the Trust or units in the Separate Account would be calculated. But any attempt to show that Plaintiff and the purported class was misled would necessarily run afoul of SLUSA.

This is precisely the logic the Seventh Circuit adopted in *Kircher*. It noted that investors like Plaintiff here would have no claim at all if the prospectus for the securities in question had alerted them to the fact that "daily valuations left no-load funds exposed to short-swing trading strategies." 403 F.3d at 484. The court then went on to state that this "observation[] show[s] that plaintiffs' claims depend on statements made or omitted in connection with their own purchases of the funds' securities," citing in support of that conclusion the fact that most of the 200 lawsuits that have been filed in the last two years by investors who claim to be harmed by stale pricing have been filed in federal court under Section 10(b). *Id.* Plaintiff's effort to redefine his claim in this case to eliminate any overt allegation of misrepresentation is, like the artful pleading rejected in *Kircher*, an effort to evade the PSLRA to litigate a securities class action in state court "in the hope that a local judge or jury may produce an idiosyncratic award . . . the very sort of maneuver that SLUSA is designed to prevent." *Id.*

**B. Plaintiff's Attempt To Limit The Proposed Class To Holders Cannot Avoid SLUSA Preemption.**

Plaintiff has amended his complaint in a way that is designed to eliminate all purchasers and sellers from the proposed class. Under the Seventh Circuit's decision in *Kircher*, however, even a legitimate class of holders can be barred from proceeding by SLUSA if the class seeks damages as a result of misrepresentations made in connection with *someone else's* purchase or

sale of securities.  In *Kircher*, the Seventh Circuit concluded that the term "in connection with the purchase or sale of securities" as used in SLUSA was not intended to be limited by the *Blue Chip Stamps* purchaser-seller rule.  Thus, a defendant need not show that the plaintiff was a purchaser or seller who would have standing to bring his own Section 10(b) claim. Instead, it is enough if the defendant's alleged conduct was in connection with the purchase or sale and therefore would be subject to an SEC enforcement action under Section 10(b).  403 F.3d at 483-84.

As the Seventh Circuit recognized, this standard is easily met in a case like this.  The pricing of units in a Separate Account or shares in a mutual fund is necessarily conduct that is in connection with the purchase or sale of a security.  Indeed, the whole point of providing daily prices for these securities is to enable them to be purchased and sold.  Furthermore, Plaintiff himself alleges that there is no injury to anyone as a result of the claimed mispricing absent a purchase or sale of the units at an artificially deflated or inflated price.  FAC ¶¶ 35-37.

Indeed, even holders cannot tell whether they suffered any real damages unless and until they sell the units whose value has allegedly been diluted for a price that reflects the reduced value.  As Plaintiff alleges, the pricing methodology Equitable allegedly employed may even help holders, if more investors buy on a day when fund shares are artificially inflated than sell. FAC ¶ 37.  Thus, unless and until a holder sells his or her units, it is impossible to know whether he or she has suffered any harm.  That is enough, in and of itself, to meet the "in connection with" requirement.

*Kircher* is not binding on this Court.  But where there is no controlling law in this Circuit, "the law of the transferor forum on a federal question" does "merit close consideration."  *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir. 1987).  In any event, even if the Court decides that SLUSA is limited to claims brought by a purchaser or seller, Plaintiff's

attempt to carve out a holder class fails.  In *Dabit v. Merrill Lynch, Pierce, Fenner & Smith*, 395 F.3d 25, 43 (2d Cir. 2005), the Second Circuit concluded that SLUSA's "in connection with" requirement was intended to be co-extensive with the *Blue Chip Stamps* requirement. Nevertheless, the court held that a purported "holder" class would be preempted if the class definition included persons with SLUSA-preempted claims and the complaint offered no way for the court to identify a permitted subclass. *Id.* at 46. In *Atencio v. Smith Barney*, 2005 U.S. Dist. LEXIS 1526 (S.D.N.Y. Feb. 2, 2005), the court applied this rule and dismissed a claim brought on behalf of a purported class of holders.  The court noted that plaintiffs' claims were "closely intertwined with the purchase and sale" of the securities in question and that the named plaintiff and undoubtedly other members of the class had made purchases or sales during that period.  *Id.* at *17. Because the class clearly included purchasers whose claims were based on the same allegations as those asserted by "holders," the court held that the complaint was preempted by SLUSA.

The same analysis applies here.  Plaintiff has purported to carve out claims based on purchases and sales.  But he does not suggest that members of the purported class did not engage in any purchasing or selling activity during the relevant period.  In fact, the prospectus that Plaintiff received explains that all dividends paid by the Trust to the Separate Account would be reinvested in the Trust portfolios.  Hudson River Trust Prospectus, attached to Ex. 2, at 31. Thus, every investor who "held" his or her position was necessarily buying additional units on a regular basis.  Plaintiff alleges that those units were inaccurately priced during the relevant period.  As a result, it appears that *every* member of the purported class would have the same claim against Equitable as a purchaser that Plaintiff seeks to assert as a holder.  Under these circumstances, Plaintiff's class claim would be preempted even under the narrower view of SLUSA adopted by the Second Circuit. *See In re Alger, Columbia, Janus*, *MFS, One Group and*

*Putnam Mutual Fund Litig.*, 320 F.Supp.2d 352, 354 n.3 (D. Md. 2004) (observing that excluding all purchasers from the class to avoid SLUSA might require excluding everyone who bought shares pursuant to an automatic dividend reinvestment program during the period). *See also Kircher,* 403 F.3d at 482 (a class that includes people who purchased or sold during the period "is a flop . . . [as] an effort to evade SLUSA"); *Rowinski*, 398 F.3d at 303 (a "broad class definition [that] is not limited to non-purchasers and non-sellers" and therefore necessarily includes preempted claims cannot survive a SLUSA challenge).

Furthermore, Plaintiff has not bothered to define the alleged class period or to explain how or why purchases by purported class members can be disregarded.  In *Dabit*, the court concluded that investors who bought and then held a security based on allegedly misleading statements could not circumvent SLUSA by disclaiming any cause of action based on the initial purchase and seeking damages only as holders. 395 F.3d at 44-45.  But that is precisely what Plaintiff has tried to do here.  The members of the purported class had to have purchased their annuities and allocated their investments at some point in time.  As Plaintiff himself recognizes, any claim based on those purchases or allocations would plainly be preempted by SLUSA because such claims would inevitably revolve around Equitable's failure to disclose the alleged mispricing of the units and the risk of market-timing.  Under *Dabit*, SLUSA also preempts any class claim based on the *retention* of the securities based on the same omissions.[5]

## II.    PLAINTIFF LACKS STANDING TO BRING CLAIMS
## BASED ON ALLEGED DILUTION OF THE SEPARATE ACCOUNT.

To the extent that Plaintiff's negligence claim is not barred by SLUSA, he lacks standing to bring such a claim.  Plaintiff himself recognizes that the alleged harm in this case (dilution)

---

[5]    Of course, if Plaintiff or class members were aware of the alleged mispricing or the risks of market-timing when they purchased their annuities or allocated their investments, they would not have a claim under either state or federal law.

was not inflicted on individuals, but rather on the pool of assets held in the Separate Account. FAC ¶ 49. Plaintiff claims that he has standing to bring this action because he and the other investors in variable annuities, rather than Equitable, own those assets. But in making that claim, Plaintiff simply ignores the clear terms of his contract with Equitable, which recites in no uncertain terms that under New York law the assets in the Separate Account belong to Equitable. Ex. 2 at 4. *See also* NY CLS Ins. § 4240(12) (2005) ("Amounts allocated by the insurer to separate accounts shall be owned by the insurer, the assets therein shall be the property of the insurer. And no insurer by reason of such accounts shall be or hold itself out to be a trustee"). Thus, it necessarily follows that only Equitable would be able to bring a claim against the Trust for mispricing the shares that were purchased by the Separate Account.[6]

In any event, even if the Court were to collapse the structure created by the parties' agreement and treat the policyholders, as Plaintiff suggests, as if they owned the shares of the Trust (FAC ¶ 12), that would not give them the right to bring this suit. Even assuming that Equitable was responsible for managing the Trust, if the Trust's assets were mismanaged — because it paid out too much to people who sold when prices were artificially high and did not charge enough for shares when prices were artificially low — it is up to the trustees of the Trust to take action. Where, as in this case, it is the entity itself that is allegedly injured, rather than the shareholders individually, the claim must be brought by the entity or by shareholders suing derivatively on its behalf. Because such claims are derivative in nature, courts have "routinely" dismissed direct claims brought by mutual fund investors alleging dilution of their interests in the fund. *See, e.g.*, *In re Merrill Lynch & Co.*, 272 F.Supp.2d 243, 260 (S.D.N.Y. 2003) (plaintiff's

---

[6]    No one could have a claim for mispricing of the units in the Separate Account. The Prospectus clearly discloses that the pricing of the units is based on the daily pricing of the Trust shares "as reported by the Trust." Ex. 2 at 10.

allegations that her injuries arose "because the Fund's net asset value declined . . . plainly show

that plaintiff's alleged injury was derivative, by virtue of her ownership of shares in the Fund");

*Kircher*, 403 F.3d at 483 (any claim for mismanagement of the fund "likely would need to be

cast as a derivative action"); *Lapidus v. Hecht*, 232 F.3d 679, 683-84 (9th Cir. 2000) (mutual

mutual fund investors may not maintain a direct action where "the only injury to the shareholders

is the indirect harm which consists of the dimunition in the value of his or her shares").

Accordingly, even under his own theory, Plaintiff lacks standing to assert a mismanagement

claim directly, and the complaint should be dismissed for that reason alone.

## III.   PLAINTIFF'S CLAIMS ARE PREEMPTED BY THE UNIFORM FEDERAL STANDARDS FOR THE VALUATION OF SECURITIES.

Plaintiff's negligence claim is also preempted by federal law because any state law claim

regarding the valuation of securities intrudes into an area that Congress has reserved exclusively

for federal jurisdiction.  The pricing of the securities at issue here is extensively regulated and

governed exclusively by federal statutes and regulations. The state law claims asserted by

Plaintiff are preempted because they seek to impose on Equitable duties that would interfere with

these uniform federal requirements by allowing state court juries to establish obligations in

hindsight  regarding the valuation of securities — obligations that would undoubtedly conflict

with federal standards or vary based on the law of each state. The resulting patchwork of state

law duties would be directly contrary to the nationwide standards mandated by federal law.

### A.   State Law Claims Are Preempted When They Seek To Impose Duties That Conflict With Federal Law.

Federal law preempts state laws that "interfere with, or are contrary to, federal law."

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712 (1985).

Claims based on state law are preempted when "it is impossible for a private party to comply

with both state and federal requirements, . . . or where state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). State law claims that conflict with, or interfere with the purpose of, federal regulations are also preempted. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699 (1984). Thus, for example, in *Geir v. Am. Honda Motor Co*., 529 U.S. 861 (2000), the Supreme Court held that state law negligence claims based upon the absence of an airbag in plaintiff's car were preempted because Congress had affirmatively decided *not* to require airbags in all instances and state tort lawsuits would therefore stand as an obstacle to federal objectives.

In this case, Plaintiff's negligence claim conflicts with the standards imposed on registered investment companies (including the Separate Account and the Trust) by the Investment Company Act of 1940, 15 U.S.C. § 80a-1, *et seq.* ("the 1940 Act"), and the rules promulgated thereunder.  Those rules dictate when and how registered investment companies value interests in securities held within subaccount funds.  15 U.S.C. §§ 80a-2(a)(41), 80a-22(c); 17 C.F.R. § 270.22c-1.  They necessarily preempt any conflicting state law rules because one of the key reasons for establishing a comprehensive regulatory scheme was to ensure that there was a single set of rules for valuing mutual fund shares.  *See U.S. v. Nat'l Assoc. of Sec. Dealers, Inc.,* 422 U.S. 694, 706-710 (1975). Congress delegated broad authority to the SEC to regulate the business practice of mutual funds, including the valuation of investments and the pricing of shares.  15 U.S.C. §§ 80a-2a(41)(B), 80a-22(c), 80a-38(a); *see also Nat'l Assoc. of Sec. Dealers, Inc.*, 422 U.S. at 704-705 ("The Act vests in the SEC broad regulatory authority over the business practices of investment companies.").

Plaintiff does not allege that the valuation practices that Equitable or its fund managers employed during the relevant period violated either the 1940 Act or any SEC requirements.

Instead, Plaintiff seeks to use state law to retroactively impose *different* valuation requirements on Equitable and other variable annuity providers and mutual funds.  It is unclear from the complaint what exactly Plaintiff believes Equitable should have done to protect him from market timers.  What is clear from the complaint, however, is that Plaintiff seeks to impose state law duties in an area that is comprehensively governed by federal law.  Any such duties, which would inevitably vary by state, would plainly "stand[] as an obstacle to the accomplishment of the full purposes and objectives of Congress" because they would interfere with the single nationwide standard, created by Congress, and implemented by the SEC, for the valuation of securities.  *See Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002)*; see also Patneaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020, 1026 (9th Cir. 2002) (explaining that the PSLRA, the NSMIA, and SLUSA "demonstrate that Congress intended to provide national, uniform standards for securities markets and nationally marketed securities").

### B.    The National Securities Markets Improvement Act Expressly Preempts Plaintiff's Claims.

Plaintiff's negligence claim is also expressly preempted by the National Securities Markets Improvement Act ("NSMIA").  In 1996, Congress vested sole regulatory power over nationwide securities in the SEC.  *See* NSMIA, PL 104-290, Stat. 3417 (1996).  Congress determined that dual federal and state regulation of securities was "redundant, costly, and ineffective," and concluded that "this duplicative regulation tends to raise the cost of capital to American issuers of securities without providing commensurate protection to investors or to our markets."  H.R. Conf. Rep. No. 104-864 at 39 (1996).  Therefore, Congress provided that securities that "are inherently national in nature" are "subject to only Federal regulation," with states retaining power to regulate only intrastate and regional securities.  *Id.* at 40.

Section 102 of NSMIA, entitled "Creation of National Securities Markets," and codified at 15 U.S.C. § 77r, expressly preempts state laws or regulations that "directly or indirectly prohibit, limit, or impose conditions, based on the merit of such offering or issuer, upon the offer or sale of any security." 15 U.S.C. § 77r(a)(3). Plaintiff's negligence claim seeks to accomplish precisely the result that Congress prohibited — using state law to impose additional conditions on the sale of nationwide securities by requiring investment companies to conform to state-imposed pricing guidelines. Accordingly, that claim is preempted.

## CONCLUSION

For the foregoing reasons, Equitable respectfully requests that the Court dismiss plaintiff's complaint, in its entirety, for failure to state a claim upon which relief can be granted.

Dated: July 8, 2005                Respectfully submitted,


                                   AXA EQUITABLE LIFE INSURANCE
                                   COMPANY, f/k/a THE EQUITABLE LIFE
                                   ASSURANCE SOCIETY OF THE UNITED STATES


                                   By:   /s/ Maggie J. Schneider
                                        One of its Attorneys

Michele Odorizzi
Sheila Finnegan
Maggie J. Schneider (Bar I.D. # 26831)
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600 (Telephone)
(312) 701-7711 (Facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2005, I electronically filed with the Court **Equitable's Memorandum in Support of Its Motion to Dismiss the First Amended Complaint**, service to be made on the following by electronic filing:

Francis Joseph Balint, Jr, fbalint@bffb.com
Eugene Barash, ebarash@koreintillery.com
Andrew Steven Friedman, afriedman@bffb.com, rcreech@bffb.com
George A Zelcs, gzelcs@koreintillery.com


and service to be made on the following by first class mail, postage prepaid:

Timothy G Blood
William J Doyle
John J Stoia, Jr.
Milberg Weiss
401 B St., Suite 1700
San Diego, CA 92101-3311

Amelia F Burroughs
Lerach Coughlin
401 B St., Suite 1700
San Diego, CA 92101

Robert L King
Swedlow and King Chicago
70 W Madison St Ste 660
Three First National Plz
Chicago, IL 60602

Stephen M Tillery
Korein Tillery Swansea
10 Executive Woods Ct
Swansea, IL 62226-2030


_____/s/ Maggie J. Schneider_____
            Maggie J. Schneider