**UNITED STATE DISTRICT COURT
DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | ) | |
| —————————————————————— | ) | MDL 1586 |
| | ) | |
| MATTHEW WIGGENHORN, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:05-CV-01674-JFM |
| | ) | |
| AXA EQUITABLE LIFE INSURANCE COMPANY f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM
<u>IN OPPOSITION TO EQUITABLE'S MOTION TO DISMISS</u>**

Plaintiff is a variable annuity owner. Variable annuities are an investment vehicle through which an annuity owner invests in mutual funds.[1] Until recently, market timing in variable annuities was as rampant as it had been in mutual funds. Thus, the core issues in the mutual fund litigation are similar in variable annuity cases like this one with one difference. Plaintiff has sued Equitable on a state common law theory of negligence. As a result, variable annuity cases like this one present unique questions not raised in the other state law cases involving claims of breach of contract and breach of fiduciary duty.

Equitable contends that Plaintiff's negligence claim necessarily involves claims of deceit and manipulation in connection with the sales and purchases of covered securities and is thus preempted by SLUSA; that Plaintiff lacks "standing" to pursue such a negligence claim; and that such a claim is

---

[1] In *Mehta v. AIG SunAmerica Life Assurance Co.*, before the Court in No. 04-MD-15683-JFM, Plaintiff Mehta has explained in detail the interrelationship of variable annuities and the mutual funds in which they invest in her Memorandum in Opposition to AIG's Motion for Judgment on the Pleadings. Plaintiff adopts that explanation and the arguments Plaintiff Mehta has made in that case, as well as the arguments Plaintiff Woodbury has made in *Woodbury v. Nationwide Life Ins. Co.*, also before the Court in No. 04-MD-15683-JFM.

preempted by the Investment Company Act of 1940 and the National Securities Market Improvement

Act (NSMIA). Those arguments reflect a fundamental misunderstanding of the nature of the claim

Plaintiff has asserted in his First Amended Complaint.

<u>Plaintiff's Negligence Claim</u>

The injury for which Plaintiff seeks to recover in this case is the dilution of the value of his variable

annuity caused by market timing in the annuity's underlying mutual fund. Plaintiff does not now and

never has maintained that but for some misrepresentation (or material omission) by Equitable at the time

of sale of the annuity, he would not have purchased the variable annuity. Rather, Plaintiff contends that

his investment could have been a better one but for Equitable's negligent management of the underlying

mutual fund which permitted market timing by third parties whose trades diluted the value of Plaintiff's

investment.

The difference in those two kinds of claims is a stark and important one. To demonstrate the point,

consider a plaintiff who hires an architect to build a structure for him. The plaintiff is induced to hire the

architect by a sterling resumé: the architect claims that he went to the finest schools, that he has worked

for the finest architectural firms, and that he has years of incomparable professional experience.

However, when he performs the work for which the plaintiff hires him, he makes critical errors, errors

which no competent architect would make—negligent errors. When he sues to recover for his damages,

the plaintiff has two choices. He might sue for fraud in the inducement if he has reason to believe that

the architect's resumé was fraudulent. On the other hand, he might simply sue for the damages he

sustained as a result of the architect's negligence, and he could do so despite the fact that the architect's

resumé was fraudulent. If he chooses this latter course, the plaintiff's negligence claim is not somehow

converted into a fraud claim merely because the plaintiff may arguably have also had some basis for bringing a fraud claim. All of that is equally true in this case.

Perhaps Equitable did make misrepresentations or failed to disclose material facts regarding market timing or fair value pricing in its prospectus, but Plaintiff has certainly not alleged that in his First Amended Complaint. Rather, Plaintiff has alleged that *after his purchase* Equitable negligently exposed him to market timing. Plaintiff was not exposed to market timing on the day he purchased his annuity; indeed, it is factually impossible for Plaintiff to have been exposed to market timing on the day of his purchase. A market timer's trade on the day that Plaintiff purchased his variable annuity would have no effect whatsoever on Plaintiff's investment. Rather, only after Plaintiff became a holder was it possible for market timing in the variable annuity to dilute the value of Plaintiff's investment. The same is true of any member of the class Plaintiff seeks to represent. The claim Plaintiff has asserted on behalf of class members does not include any allegations of deceit or manipulation. Moreover, the market timing injury is one which no class member could have sustained on any date which a class member might have purchased a variable annuity.

Similarly, even if a Plaintiff's or a class member's reinvestment of dividends in the annuity constitutes a "purchase" of a security within the meaning of section 10(b) or SLUSA, Plaintiff and class members could not have been injured by market timing in connection with *those* "purchases" any more than they could have been injured by market timing on the dates of their original purchases. Thus, unless a plaintiff were to claim—as some mutual fund plaintiffs have but as Plaintiff Wiggenhorn has disavowed—that he was fraudulently induced to purchase a variable annuity (or mutual fund) or to reinvest in one by the misrepresentations or material omissions of the issuer, then he has simply not alleged deceit or manipulation "in connection with the purchase or sale" of a security.

3

Equitable argues that "[t]he claim that the prices of securities were artificially inflated necessarily includes a claim that the value of the securities was misrepresented," but that is a mischaracterization of the authority Equitable cites, *Araujo v. John Hancock Life Ins. Co.*, 206 F.Supp.2d 377 (E.D.N.Y. 2002). While it is true that "when a plaintiff alleges that ***she or he purchased a security*** after relying on a misrepresentation as to its value," the "in connection with" element is satisfied. *Id*. at 383 (emphasis added). Plaintiff has not alleged that here. Rather, Plaintiff has alleged that Equitable negligently calculated the annuity's "unit values" which it sold to third party market timers. Thus, to the extent that Equitable may be said to have "misrepresented" the annuity's unit values, it was not in connection with ***Plaintiff's*** purchases or sales of annuity units but, instead, was in connection with the market timers' purchases and sales of annuity units.

These are the factual allegations in Plaintiff's First Amended Complaint. Just as this Court is not bound by Plaintiff's characterization of those factual allegations, the Court is also not bound by Equitable's attempt to re-characterize those factual allegations as allegations of deceit or manipulation. As discussed below, because Plaintiff's negligent management claim against Equitable is not in connection with ***his own*** purchase or sale of annuity units, it is not actionable under the federal securities laws (particularly Rule 10b-5) and it is not preempted by SLUSA.

## I.  SLUSA DOES NOT PREEMPT HOLDERS' NEGLIGENCE CLAIMS

Ensuring recovery for holders who may have "suffered dilution of the value of their shares from wrongdoing in a securities market …."and avoiding "the danger of vexatious litigation … [which] 'benefit[s] … speculators and their lawyers' at the expense of innocent investors" are two laudable goals which have motivated this Court to consider "recognition of a federal cause of action under Rule 10(b)(5)" for holders. *In re Alger, Columbia, Janus, MFS, One Group and Putnam Mutual Fund Litig.*,

320 F.Supp.2d 352, 356 (D. Md. 2004). In that vein, the Court has questioned whether the purchaser-

seller rule of *Blue Chip Stamps* should be applied in interpreting "the meaning of the term 'in connection

with the purchase or sale of a covered security'" when interpreting SLUSA, given that the *Blue Chip*

*Stamps* "holding was based primarily upon prudential considerations," considerations similar to those

which led Congress to enact both the PSLRA and SLUSA. *Id*. at 355.

Defendants like Equitable, on the other hand, have pressed the position that a holder's state law

claims are "in connection with the purchase or sale" of his mutual fund shares for purposes of SLUSA

removability and preemption, but that holders have no federal securities law claims because any such

claims are ***not*** "in connection with the purchase or sale" of their mutual fund shares for purposes of

section 10(b) and Rule 10b-5. That vacillating construction of the same phrase in the same Act surely

cannot be the law. And as discussed below, it isn't.

While Plaintiff wholeheartedly agrees with this Court's sentiments regarding the need for—and

other plaintiffs' efforts in this MDL proceeding to establish—a national forum and a federal remedy for

mutual fund holders who were injured by market timing, Plaintiff submits that realities of a well-

established body of 10b-5 law over the last 50 years, longstanding rules of statutory construction, settled

principles of federal preemption, SLUSA's legislative history, a nearly-unanimous body of SLUSA case

law, and the very text of the *Blue Chip Stamps* decision together promise to unravel on appeal whatever

good this Court may endeavor to accomplish on behalf of injured shareholders if the vehicle for

recovery is a 10b-5 action for holders. This is not to suggest, however, that the Court cannot still provide

a national forum, even if the remedy is not a federal one.

Plaintiffs in some of the removed cases in this litigation probably have asserted one or more

SLUSA-preempted claims which makes the removal of those cases proper. After the SLUSA-mandated

dismissal of the preempted claims, any remand of non-preempted state law claims is a matter committed to this Court's sound discretion. Thus there are undoubtedly cases involving a number of mutual funds and variable annuities for which the Court will be able to provide a national forum. Even if some cases must eventually be remanded to state courts, however, the Court's authority to coordinate proceedings with state courts and its ultimate authority to issue injunctions and stays of state court proceedings, if necessary, ensure that even if there cannot be a *single* national forum for market timing litigation, there is undoubtedly a *single* national authority—this Court—which has considerable power to control market timing litigation wherever it may be litigated.

But the question which this Court is currently considering in connection with the omnibus motions to dismiss the second amended complaint in the mutual fund litigation is whether holders have any viable claims and, if so, what those claims are. Plaintiff respectfully submits that those claims cannot be Rule 10b-5 claims for holders but, contrary to the arguments of many defendants including Equitable, they can be state law claims because SLUSA does not preempt all state law claims.

As discussed below, the *Blue Chip Stamps* purchaser-seller rule—though motivated in part by prudential considerations—was an interpretation of section 10(b)'s language and that interpretation unambiguously excludes holders; the Court rejected a broad interpretation which would have extended section 10(b)'s reach to "shareholders … who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975). For the 23 years prior to *Blue Chip Stamps*, the lower federal courts had been turning holders aside; thus, for more than 50 years, holders have been left to the "remedies … available to nonpurchasers and nonsellers under state law." 421 U.S. at 739 n.9.

In SLUSA's preemption provision Congress repeated the very same statutory language which the Supreme Court interpreted in *Blue Chip Stamps*:  "in connection with the purchase or sale" of a security. Rudimentary principles of statutory construction compel the conclusion that Congress intended to incorporate the judicial gloss of *Blue Chip Stamps* in SLUSA. Nothing in SLUSA nor its legislative history suggest that Congress intended to extinguish the traditional state law claims of holders. To the contrary, Congress enacted a ***savings clause*** as part of SLUSA which preserves "any and all other rights and remedies that may exist at law or in equity" not expressly preempted by SLUSA. 15 U.S.C. 78bb(a). Thus, the state law remedies to which holders have been historically relegated remain intact, viable and not preempted by SLUSA.

While the ideal remedy for shareholders injured by market timing would perhaps be a federal one, none exists for holders. Holders' traditional state law remedies are certainly far better than no remedy at all, which is precisely the combined interpretation of SLUSA and section 10(b) that defendants like Equitable ask this Court to find: that holders have no federal remedy and that SLUSA preempts their state law remedies. This Court, however, has a "duty to accept the reading [of a statute] that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, __ U.S. __, 125 S. Ct. 1788, 1801 (2005). "If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Id.* at 1801.

**A.  Canons of statutory construction require identical language in a statute to be interpreted identically.**

"[T]he 'normal rule of statutory construction' [is] that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (quoting *Department of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)). "Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a

court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Sinai Hosp. of Baltimore, Inc. v. National Benefit Fund for Hosp. & Health Care Employees*, 697 F.2d 562, 566 (4th Cir. 1982) (citing *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329 (1981)). SLUSA does not "otherwise dictate."

**B.  The Supreme Court's interpretation of § 10(b)'s "in connection with the purchase or sale" governs the interpretation of the identical phrase in SLUSA.**

Twenty three years before Congress' enactment of SLUSA, the Supreme Court interpreted section 10(b)'s "in connection with the purchase or sale" language to require a purchase or sale by the plaintiff in the context of private civil litigation. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). "In *Blue Chip*, a putative class of offerees of shares in a newly reorganized company sued under § 10(b) and Rule 10b-5 on the basis that the prospectus distributed in association with the offering was overly pessimistic … to discourage purchases by the alleged class of offerees so that the rejected shares could then be sold at a premium to the public." *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.2d 25, 37 (2d Cir. 2005). The Supreme Court held that the offerees failed to state a claim under section 10(b), adopting the rule first laid down in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952). *Birnbaum* is the seminal case holding that only purchasers and sellers of securities had standing to sue under section 10(b). The Court wrote that "*Birnbaum*'s reasonable interpretation of the ***wording of § 10(b)***, wording which is directed toward injury suffered 'in connection with the purchase or sale' of securities, argues significantly in favor of acceptance of the *Birnbaum* rule by this Court." *Blue Chip*, 421 U.S. at 733 (emphasis added; footnote omitted).

Similarly, the Court stated that "the ***wording of § 10(b)***, making fraud in connection with the purchase or sale of a security a violation of the Act, is surely badly strained when construed to provide a

cause of action, not to purchasers and sellers of securities, but to the world at large." *Blue Chip*, 421

U.S. at 733 n.5 (emphasis added). The Court added:

> The **wording of § 10(b)** directed at fraud "in connection with the purchase or sale" of securities stands in contrast with the parallel antifraud provision of the 1933 Act … reaching fraud "in the offer or sale" of securities. ... When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly.

*Id*. at 733-34 (emphasis added). The purchaser-seller standing requirement is therefore clearly grounded

in the "purchase or sale" language of section 10(b).

The Court did not, as some have suggested, eschew reliance on the text of section 10(b) in

preference to "policy considerations"; rather, the Court relied upon policy considerations **in addition to**

the text of the statute because the text alone was not conclusive. As the Court explained:

> we would by no means be understood as suggesting that we are able to divine from the language of § 10(b) the express "intent of Congress" as to the contours of a private cause of action under Rule 10b-5. When we deal with private action under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn. … [I]t would be disingenuous to suggest that … Congress in 1934 …foreordained the present state of the law with respect to Rule 10b-5.

421 U.S. at 737. Thus, the Court concluded, "[i]t is therefore proper that we consider, **in addition to** the

factors already discussed, what may be described as policy considerations **when we come to flesh out**

**the portions of the law** with respect to which neither the congressional enactment nor the administrative

regulations offer conclusive guidance." *Id*. (emphases added).

"The law" which the Court "fleshed out" was the "in connection with the purchase or sale" language

of section 10(b) and Rule 10b-5. Three members of the six justice majority in *Blue Chip Stamps*

certainly understood the decision to be based upon the language of section 10(b), as they wrote a

concurring opinion "to emphasize the significance of the text[]" of the statute, "especially the language

of § 10(b)." 421 U.S. at 755 (Powell, Stewart & Marshall, JJ., concurring). "The critical phrase in both

the statute and the Rule is 'in connection with the purchase or sale of any security.'" *Id*. at 756. As

Justice Powell wrote:

> Our task in this case is to construe a statute. In my view, the answer is plainly compelled by the language as well as the legislative history of the 1933 and 1934 Acts. But even if the language is not "plain" to all, I would have thought none could doubt that the statute can be read fairly to support the result the Court reaches.

*Id*. at 760. The three dissenters also understood the Court's opinion to be an "interpretation" of section

10(b) and to "purport[] to find support in 'evidence from the texts of the 1933 and 1934 Acts.'" *Id*. at

769 (Blackmun, Douglas & Brennan, JJ., dissenting).

Thus, the Supreme Court's interpretation in *Blue Chip Stamps* of the "in connection with the

purchase or sale" language of section 10(b) was well-settled law for the 23 years prior to Congress'

enactment of SLUSA. This Court therefore "'must infer, unless the statute otherwise dictates, that

Congress means to incorporate the established meaning of these terms.'" *Sinai Hospital*, 697 F.2d at

566. Accordingly, the Court should hold that the scope of SLUSA's preemptive reach is coterminous

with scope of section 10(b), which does not include holders in private litigation.

**C.  SLUSA's savings clause preserves holders' claims.**

Not only "must" a court infer that Congress intended to incorporate in SLUSA the *Blue Chip Stamps*

interpretation of the "in connection with the purchase or sale" language, Congress explicitly preserved

"any and all other rights and remedies that may exist at law or in equity" which it did not expressly

preempt in SLUSA. 15 U.S.C. § 78bb(a). If the only state law claims Congress preserved were those

explicitly enumerated in SLUSA itself, SLUSA's savings clause would be redundant. Such an

interpretation of SLUSA would run afoul of the "well-recognized canon of construction [that] requires

courts to read statutory provisions so that, when possible, no part of the statute is superfluous." *United*

*States v. Childress*, 104 F.3d 47, 52 (4th Cir. 1996). Thus, there must be at least *some* "other rights and

remedies" that Congress intended to preserve beyond the expressly codified exceptions. Holders' claims—never mentioned in SLUSA or its legislative history—must be among those preserved state law remedies.

**D.  SLUSA's legislative history and the law governing the interpretation of preemption statutes further supports an interpretation of SLUSA's preemption provisions consistent with *Blue Chip Stamps*.**

"[I]n all pre-emption cases, and particularly in those [where] Congress has legislated ... in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The assumption against preemption applies not only "to the question whether Congress intended any pre-emption at all," but also "to questions concerning the *scope*" of an express preemption statute. *Id.* at 485 (emphasis in original) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 523 (1992) (where the Court "used a 'presumption against the pre-emption of state police power regulations' to support a narrow interpretation of such an express" preemption statute)).

The law governing holders' claims is such "a field which the States have traditionally occupied." Since the 1952 decision in *Birnbaum* first announcing the rule that only purchasers and sellers may assert claims under section 10(b), non-purchasers and non-sellers have been left to the "remedies … available to nonpurchasers and nonsellers under state law." *Blue Chip*, 421 U.S. at 738 n.9. Accordingly, this Court must assume that Congress did not intend to supercede these "historic police powers of the States … unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485. Nothing in SLUSA's text suggests that Congress intended to preempt the state law claims of non-purchasers and non-sellers who have no remedy under the 1933 and 1934 Acts. *Dabit v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 395 F.2d 25, 39 (2d Cir. 2005) ("we see no clear indication either in the text or the legislative history of SLUSA of a congressional intent to abolish nonpurchaser and nonseller state class action claims").

Nothing in SLUSA's text suggests that Congress intended to preempt the state law claims of holders who have no remedy under the 1933 and 1934 Acts. The only explanation of Congressional intent that squares with both the text of SLUSA and its legislative history is that Congress intended to close the "loophole" in the PSLRA which had resulted in a shift of traditional, federal securities class action lawsuits from federal to state courts. *See* S. Rep. No. 105-182, 1998 WL 226714, at *9 ("This legislation is designed to address an unforeseen 'loophole' in the 1995 Private Securities Litigation Act, that has blocked that law from accomplishing its stated goal of reforming private securities litigation."). Congress' goal of establishing national standards is attained by bringing back to federal courts the litigation which had shifted to state courts in the wake of the PSLRA. SLUSA ensures that the PSLRA's reforms cannot be evaded through state court litigation. It thereby "nationalizes" the stringent PSLRA reforms. But the PSLRA amended the 1933 and 1934 Acts and was therefore limited to establishing uniform standards in securities class actions under those two statutes and not in securities-related litigation which has never been actionable under the 1933 or 1934 Acts.

The Supreme Court has long admonished courts to err on the side of caution whenever there are doubts about Congress' intent to preempt state law. "An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous." *Penn Dairies v. Milk Control Comm'n*, 318 U.S. 261, 275 (1943). SLUSA's text, its legislative history and canons of statutory construction at the very least cast doubt on the proposition that SLUSA preempts

holders' state law claims in connection with their retention of securities.  Every federal court, save one, to have addressed the issue has held that such claims are not preempted, as discussed in the next section.

**E.  Numerous other courts have almost unanimously concluded that SLUSA's "in connection with the purchase or sale" language incorporates the *Blue Chip Stamps* holding and that SLUSA does not preempt claims in connection with the retention of a security.**

The "in connection with the purchase or sale" language has "engendered tremendous amounts of litigation and received substantial judicial attention" and is "language that, at the time of SLUSA's enactment, had acquired settled, and widely-acknowledged, meaning in the field of securities law, through years of judicial construction in the context of § 10b-5 lawsuits." *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1342-43 (11th Cir. 2002). Indeed, years before *Blue Chip Stamps*, the Supreme Court had held that the statutory "terms 'purchase' and 'sale' are relevant only to the question of statutory coverage" "which may arise in determining who, if anyone, may bring private actions under § 10(b) and Rule 10b-5," a "'standing' problem." *SEC v. National Sec., Inc.*, 393 U.S. 453, 468 n.9 (1969).

In *Green v. Ameritrade, Inc.*, 279 F.3d 590, 595 (8th Cir. 2002), the Eighth Circuit held that "Congress designed SLUSA to close a perceived loophole in the pleading requirements of the" PSLRA. "To interpret this ['in connection with'] language we look to cases interpreting identical language found in SEC Rule 10b-5 and § 10(b) of the Securities Exchange Act of 1934," and "[t]he Supreme Court has clearly explained the meaning of this language in the context of SEC Rule 10b-5 and § 10(b)" in *Blue Chip Stamps*. *Id*. at 597 (citations omitted).

In *Ameritrade*, the Eighth Circuit rejected the defendant's argument that the Court should:

interpret the "in connection with" requirement flexibly, but we cannot ignore the plain language of the statute and the cases applying that language, both in the context of SLUSA and as interpreted in Rule 10b-5 and § 10(b) cases. Our inquiry leads us inevitably to the conclusion that nonsellers and nonpurchasers of securities are not covered by SLUSA's preemption

provision. We believe that, in enacting SLUSA, Congress did not make class actions on behalf of "nonsellers" and "nonpurchasers" removable to federal court. In enacting the Uniform Standards Act, Congress was aware of the interpretation of § 10b of the 1934 Act, which acknowledged that causes of actions for the "nonpurchase" or "nonsale" of securities were not covered by the 1934 Act, and that state law would fill those gaps.

*Id*. at 598. Similarly, in *Riley* the Eleventh Circuit held:

Analogizing to § 10b-5 is particularly appropriate because SLUSA was specifically enacted as an amendment to the 1933 and 1934 Acts (and their successor statutes). In enacting SLUSA, therefore, Congress was not writing on a blank slate; instead, it was legislating in an area that had engendered tremendous amounts of litigation and received substantial judicial attention. In using the phrase "in connection with the purchase or sale of a covered security," Congress was not creating language from a vacuum; instead, it was using language that, at the time of SLUSA's enactment, had acquired settled, and widely-acknowledged, meaning in the field of securities law, through years of judicial construction in the context of § 10b-5 lawsuits. Under these circumstances, we must presume that Congress intended the phrase "in connection with the purchase or sale of a covered security" to have the same meaning in SLUSA that it has in § 10b-5.

*Riley*, 292 F.3d at 1342-43; *accord Behlen v. Merrill Lynch*, 311 F.3d 1087, 1093 (11th Cir. 2002)

(Supreme Court "has interpreted the identical ['in connection with'] phrase as it appears in Rule 10b-5,

which implements section 10(b) of the 1934 Act").

*Riley* is particularly instructive because it discusses holder claims of the sort involved in the present

case. "[U]nder *Blue Chip*, SLUSA does *not* apply to claims dealing *solely* with the retention of

securities, rather than with purchase or sale." 292 F.3d at 1345 (emphases in original). In *Riley*, the

Eleventh Circuit agreed that with "carefully-crafted allegations," state law claims can still be pursued

under state law as they were "in *Gutierrez* [*v. Deloitte & Touche, L.L.P.*, 147 F.Supp.2d 584, 592-94

(W.D. Tex. 2001).]" *Riley*, 292F.3d at 1345.

The Second Circuit is the most recent circuit to hold that "to be preempted, an action must allege a

purchase or sale of covered securities ***made by the plaintiff or members of the alleged class***." *Dabit v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.2d 25, 43-44 (2d Cir. 2005) (emphasis added). "The

reach of the 'in connection with' phrase, while broad, is of course not unlimited." *Id* at 37. "The fraud must be 'integral to the purchase and sale of the securities in question.'" *Id*. "[I]n enacting SLUSA Congress sought only to ensure that class actions brought by plaintiffs who satisfy the *Blue Chip* purchaser-seller rule are subject to the federal securities laws." *Id*. at 43

Numerous district courts, applying the same *Blue Chip Stamps*-based rationale have remanded cases involving holder claims because they are not preempted under SLUSA. *See, e.g., Meyer v. Putnam Int'l Voyager Fund*, 220 F.R.D. 127 (D. Mass. 2004); *Grabow v. PricewaterhouseCoopers LLP*, 313 F.Supp.2d 1152 (N.D. Okla. 2004); *Dacey v. Morgan Stanley Dean Witter & Co.*, 263 F.Supp.2d. 706, 710 (S.D.N.Y. 2003); *Gutierrez v. Deloitte & Touche, L.L.P.*, 147 F.Supp.2d 584, 592-94 (W.D. Tex. 2001).[2]

**F.   SEC enforcement cases like *Zanford* do not change the conclusion that SLUSA incorporates the *Blue Chip Stamps* purchaser-seller rule.**

More recent cases, such as *SEC v. Zandford*, 535 U.S. 813 (2002) and *United States v. O'Hagan*, 521 U.S. 642 (1997), broadly interpreting the "in connection with" language in the context of SEC enforcement actions and criminal prosecutions are inapplicable to private litigation which, after all, is precisely the kind of litigation to which SLUSA and *Blue Chip Stamps **do*** apply. Such enforcement cases are fully compatible with *Blue Chip Stamps* because they focus on different language in the "in connection with the purchase or sale" clause than was at issue in *Blue Chip Stamps*.

In *Zandford* and *O'Hagan*, the Court was focused on the words "in connection with" because the issue in those cases was the sufficiency of the nexus between the alleged misconduct and a purchase or

---

[2] *See also Feitelberg v. Credit Suisse First Boston LLC*, 2003 WL 22434098 at *5 (N.D. Cal. Oct. 24, 2003); *Chinn v. Belfer*, 2002 WL 31474189 at *4 (D. Or. June 19, 2002); *Shen v. Bohan*, 2002 WL 31962136 at *3 (C.D. Cal. Oct. 17, 2002); *Shaev v. Claflin*, 2001 WL 548567 *5 (N.D. Cal. May 7, 2001); *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2001 WL 1182927 at *5 (S.D.N.Y. Oct. 9, 2001); *Gordon v. Buntrock*, 2000 WL 556763 at *4 (N.D. Ill. April 28, 2000); *Hines v. ESC Strategic Funds, Inc.*, 1999 WL 1705503 at *6 (M.D. Tenn. Sept. 17, 1999).

sale of securities. By contrast, in *Blue Chip Stamps* the Court's focus was on the words "purchase or sale" which are the textual basis for holding that only purchasers and sellers have standing to sue under section 10(b). *Zandford's* and *O'Hagan's* expansive reading of the "in connection with" language is not inconsistent with *Blue Chip Stamps'* more restrictive reading of the "purchase or sale" language for purposes of private litigation.[3]

### F. The Seventh Circuit's decision in *Kircher* was wrong.

In *Kircher v. Putnam Funds Trust*, 403 F.3d 478 (7th Cir. 2005), the court split with the *Riley*, *Ameritrade* and *Dabit* courts. The rationale it offered for doing so was:

> It would be more than a little strange if the Supreme Court's decision to block private litigation by non-traders became the opening by which that very litigation could be pursued under state law, despite the judgment of Congress (reflected in SLUSA) that securities class actions must proceed under federal securities law or not at all.

*Id.* at 484. But that reasoning is flawed in two respects. First, *Blue Chip Stamps* did not "block private litigation by non-traders"; it only denied non-traders a federal remedy, leaving open to them "remedies … available to nonpurchasers and nonsellers under state law." 421 U.S. at 739 n.9. Second, Congress did not decide "that securities class actions must proceed under federal securities law or not at all"; Congress decided that "covered class actions" involving allegations of deceit or manipulation "in connection with the purchase or sale of a covered security" must proceed under federal securities law or not at all. As the Second Circuit held in *Dabit*, the answer to this policy argument is that "[t]he question

---

[3] The concern expressed in the SEC's amicus brief in *Dabit* that "[a]doption of the purchaser/seller rule for SLUSA purposes" could somehow "apply to the Commission and the United States in civil and criminal enforcement cases under Section 10(b)" is unfounded. First, SLUSA does not have anything to do with enforcement cases brought by the government. Second, it is beyond all dispute that the *Blue Chip Stamps* standing requirement "imposes no limitation on the standing of the SEC to bring actions for injunctive relief under § 10(b) and Rule 10b-5" and is "inapplicable" to criminal prosecutions. *Blue Chip Stamps*, 421 U.S. at 751 n.14; *United States v. Naftalin*, 441 U.S. 768, 774 n.6 (1979). For both these reasons, interpreting SLUSA and section 10(b) consistently does not threaten to interfere in any way with governmental enforcement actions. The Second Circuit in *Dabit* rejected the position espoused in the SEC amicus brief as "unpersuasive." *Dabit*, 395 F.3d at 39.

in interpreting ambiguous statutory language … is not what Congress might sensibly want to do, but what Congress did." *Dabit*, 395 F.3d at 40.

The *Kircher* decision is poorly reasoned and it flies in the teeth of a wealth of contrary case law without offering any compelling reason for its holding. The Seventh Circuit's holding that such litigation "must be left to public enforcement" and its adoption of an interpretation of SLUSA which favors preemption are irreconcilable with the Supreme Court's decision in *Bates v. Dow Agrosciences LLC*, __ U.S. __, 125 S. Ct. 1788 (2005). As noted above, *Bates* holds that directives that courts have a "duty to accept the reading [of a statute] that disfavors pre-emption." *Id.* at 1801. In *Bates* the Supreme Court also observed that "[i]f Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Id.* at 1801.

As Equitable correctly notes, this Court is not bound by *Kircher* (Equitable Memo at 12). The Seventh Circuit's decision in *Kircher* is wrong and the Court should follow the otherwise unanimous and well-reasoned holdings of *Riley*, *Ameritrade* and *Dabit*.

**II.  Market timing cause Plaintiff to sustain a direct injury which gives rise to a distinct and direct claim for damages, not a derivative claim.**

Equitable claims that Plaintiff lacks "standing"[4] to pursue a direct action for his market timing injury, which Equitable argues incorrectly is a derivative claim. Equitable cites no authority for the proposition that an annuity policyholder like Plaintiff can institute a derivative action under any circumstances. Even if the Court were to hold that Plaintiff can bring a shareholders derivative action in this kind of situation, the claim which Plaintiff has brought here is a direct one, not a derivative claim.

---

[4] "Standing" in the context of a challenge to a shareholder's standing to bring a direct action, as opposed to a derivative action, does not implicate Article III standing or the Court's subject matter jurisdiction. *Ensley v. Cody Resources, Inc.*, 171 F.3d 315, 320 (5th Cir. 1999).

Under New York law, "[w] hether a given action can be properly classified as a shareholder's derivative action is dependent upon whether the primary injury is to the corporation." *Chalmers v Eaton*, 71 A.D.2d 721, 722-23 (N.Y. App. Div. 1979). *See also Excimer Assocs., Inc. v. LCA Vision, Inc.*, 292 F.3d 134, 140 ("[u]nder New York law, a shareholder may bring an individual suit if the defendant has violated an independent duty to the shareholder, whether or not the corporation may also bring an action"). Plaintiff's injury in this context is a direct one which need not be brought as a derivative suit.

In a similar situation, the Second Circuit held in a shareholder class action that for a shareholder "[t]o sue directly under Maryland law, a shareholder must allege an injury distinct from an injury to the corporation . . . ." *Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002). In *Strougo*, the plaintiff shareholder filed suit against the management of his closed-end mutual fund and others in connection with a coercive "rights offering" to existing shareholders, alleging both state and federal claims. *Id*. at 165-66. The district court dismissed the plaintiff's claims on the ground "that redress for the injuries alleged could only be sought through derivative, and not direct, claims." *Id.* at 165. The Second Circuit reversed.

> [U]nder Maryland law, when the shareholders of a corporation suffer an injury that is distinct from that of the corporation, the shareholders may bring direct suit for redress of that injury; there is shareholder standing. When the corporation is injured and the injury to its shareholders derives from that injury, however, only the corporation may bring suit; there is no shareholder standing. The shareholder may, at most, sue derivatively, seeking in effect to require the corporation to pursue a lawsuit to compensate for the injury to the corporation, and thereby ultimately redress the injury to the shareholders.

*Id.* at 171.

*Strougo*, like the present case, involved a shareholder's claims against a mutual fund for dilution of the shareholder's equity in the fund. A closed-end mutual fund like the one involved in *Strougo* ordinarily has only an initial public offering of shares and is subsequently closed to new investors.

> Although closed-end funds do not sell their shares to the public in the ordinary course of business, there are methods available to them to raise new capital after their initial public offering.  One such device is a "rights offering," by which a fund offers shareholders the opportunity to purchase newly issued shares. . . . It was the Fund's employment of a non-transferable rights offering that generated the claims at issue on this appeal.

*Id.* at 165. The fund in *Strougo* "announced that it would issue one right per outstanding share to every shareholder, and that every three shares would allow the shareholder to purchase one new share in the Fund." *Id*. at 165-66. The plaintiff filed suit on the grounds "that this sort of rights offering is coercive because it penalizes shareholders who do not participate." *Id*. at 166.

> Because the rights could not be sold on the open market, a shareholder could avoid a consequent reduction in the value of his or her net equity position in the fund only be purchasing new shares at the discounted price. This put pressure on every shareholder to "pony up" and purchase more shares, enabling the Fund to raise new capital and thereby increase its asset holdings.

*Id.*

The Second Circuit concluded that the injuries the plaintiff alleged constituted "distinct" injuries for which the shareholder could bring a direct claim under Maryland law. As the court explained:

> … The alleged injuries resulting from the coercive nature of the rights offering do not derive from a reduction in the value of the Fund's assets or any other injury to the Fund's business. Indeed, with reference to the shareholders that purchased new shares in order to avoid dilution, the acts that allegedly harmed the shareholders increased the Fund's assets. And as for the non-participating shareholders, the reduced value of their equity did not derive from a reduction in the value of the Fund's assets, but rather from a reallocation of equity value to those shareholders who did participate.
> Thus, in the case of both the participating and non-participating shareholders, it would appear that the alleged injuries were to the shareholders alone and not to the Fund. ***These harms therefore constitute "distinct" injuries supporting direct shareholder claims under Maryland law. The corporation cannot bring the action seeking compensation for these injuries because they were suffered by its shareholders, not itself.***

*Id.* at 175 (emphasis added). The *Strougo* rationale leads inexorably to the same conclusion in the present case.

Just as in *Strougo*, where "[t]he alleged injuries resulting from the coercive nature of the rights offering do not derive from a reduction in the value of the Fund's assets or any other injury to the Fund's business," the alleged injuries to Plaintiff in this case resulted from the sale of the annuity's undervalued units based on stale foreign securities prices and ***not*** from an injury to the Separate Account or to Equitable. Plaintiff immediately sustained an irreversible and irremediable dilution of his investment each time a market timer purchased units at an artificially low price—at a time (prior to the market timer's subsequent sale) when the assets in the Separate Account are ***increased*** by the market timer's investment. This fact makes plain that the injury is to Plaintiff, not to the Separate Account. Also as in *Strougo*, where "the reduced value of the [non-participating shareholders'] equity did not derive from a reduction in the value of the underlying fund assets, but rather from a reallocation of equity value to those shareholders who did participate," Plaintiff's reduced equity value here (*i.e.*, the reduced value of his units) did not result from a reduction in the underlying fund assets but rather from a reallocation of equity value to the market timers who bought undervalued annuity units. Thus, just as in *Strougo*, where "the alleged injuries were to the shareholders alone and not to the Fund," the stale trade injuries which Plaintiff has alleged are injuries to Plaintiff (and class members) alone and not to the Separate Account.

Moreover, as Plaintiff has alleged, the money he invested in his variable annuity is ***his*** property, not Equitable's. Equitable tries to defeat that allegation by reference to the prospectus for Plaintiff's Variable Life Insurance Policy (Equitable's Ex. 2 at 4) and a New York statute, both of which make Equitable the ***nominal*** owner of the assets in the Separate Account.  The prospectus, which Equitable only quotes in part, provides:

> Under New York law, we own the assets of the Separate Account and use them to support your policy and other variable life insurance policies. The portion of ***the Separate Account's assets*** supporting these policies ***may not be used to satisfy liabilities arising out of any other***

*business we may conduct*. This means that **the assets** supporting the Policy Account values maintained in the Separate Account **are not subject to the claims of our other creditors**.

Equitable's Ex. 2 at 4 (emphases added). Similarly, the New York statute provides:

Amounts allocated by the insurer to separate accounts shall be owned by the insurer, the assets therein shall be the property of the insurer, and **no insurer by reason of such accounts shall be or hold itself out to be a trustee**. If and to the extent so provided in the applicable agreements, the **assets in a separate account shall not be chargeable with liabilities arising out of any other business of the insurer**.

NY CLS Ins. § 4240(12) (2005) (emphases added). The clear import of both of these provisions is that Equitable holds legal title to the assets but the policyholder remains the real, beneficial owner. *See* SEC No-Action Letter, 2005 WL 756471 at *3 n.7 (April 1, 2005) ("Variable Product contract owners … are beneficial owners of Fund shares").

Because Plaintiff's injury is an injury to Plaintiff directly, Plaintiff's claim is not a derivative claim (assuming for purposes of argument that such an action exists for annuity policyholders), but is instead an individual, direct claim which only a holder can assert through a direct action.

Equitable also suggests that Plaintiff's claim would be barred by Illinois' "economic loss" doctrine. Illinois courts have held, however, that tort claims against various types of professionals (including stockbrokers, realtors, mortgage companies) come within an exception to the doctrine.[4] In *Gallagher Corp. v. Mass. Mut. Life Ins. Co.*, 940 F. Supp. 176, 178 (N.D. Ill. 1996), an insurance company provided "a split-funded defined benefit pension plan (the Plan) for the benefit of Gallagher's employees in their retirement." The court held that Mass Mutual, as a "business consultant" was the kind of "professional[] who owe[s] duties of care and loyalty to their clients which exist independent of any

---

[4] *See Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 164, 510 N.E.2d 409, 415 (1st Dist. 1987) (realtors);; *Choi v. Chase Manhattan Mortgage Co.*, 63 F. Supp. 2d 874 (N.D. Ill. 1999) (mortgage companies).

contract. Moreover, their products are often advisory in character and thus intangible, the way an attorney's brief is valuable for the ideas that it provides" and that the economic loss doctrine therefore did not apply. *Id*. at 180. For the same reasons, the economic loss doctrine does not bar this lawsuit.

**III.   Neither the Investment Company Act nor the National Securities Markets Improvement Act preempt Plaintiff's negligence claim.**

**A.   The ICA does not preempt shareholder negligence claims.**

Equitable also contends that the Investment Company Act of 1940 (ICA) preempts Plaintiff's state law claims under principles of "conflict preemption." Memo at 10. That contention finds no support in the ICA or case law and, in fact, is contradicted by both. To begin with, the ICA itself provides "nor shall anything in this subchapter affect the jurisdiction of … any State or political subdivision of any State, over any person, security, or transaction, insofar as such jurisdiction does not conflict with any provision of this subchapter or of any rule, regulation, or order hereunder."  15 U.S.C § 80a-49.  In addition to the plain language of the statute itself, the Supreme Court has held that the ICA does "not require that federal law displace state laws … unless the state laws permit action prohibited by the Act[], or unless 'their application would be inconsistent with the federal policy … .'" *Burks v. Lasker*, 441 U.S. 471, 479, 99 S.Ct. 1831, 1837-38 (1979).

The only case involving a similar claim of ICA preemption rejects the argument.  In *Green v. Fund Asset Management, L.P.*, 245 F.3d 214 (3rd Cir. 2001), shareholders in closed-end municipal investment companies sued the companies alleging state law claims of fraud and breach of fiduciary duty in connection with the method the companies used for calculating managements fees paid to advisers.  *Id.* at 217-19.  The defendants argued that these state law claims were preempted by the ICA, an argument which the Third Circuit flatly rejected.

Because Congress had found that the "corporate waste" standard was inadequate to meet the problem, it sought to provide mutual fund shareholders with additional protection from improper compensation arrangements.  Nevertheless, the fact that the prior remedy might be less effective does not mean that it stands as an obstacle to "the accomplishment and execution of the full purpose and objective of Congress."  Even though the common law is less effective than § 36(b) [of the ICA], it may still be the remedy of choice in certain situations.  The creation of a greater protection does not mean that the lesser protection is an obstacle if a complainant elects to employ it.  Moreover, the "lesser protection," even if it is more difficult for a complainant to prove a breach of the standard of care, may offer a greater range of targets and of remedies.  ***Defendants have not demonstrated that Congress intended to eliminate common law access to these targets or these remedies.***

*Id.* at 225-26 (emphasis added).  "We hold, therefore, that the plaintiffs' state law claims are not preempted by § 36(b)."  *Id.* at 230. Thus, Equitable's contention that plaintiff's claim is in conflict with and preempted by the ICA is thus not only not supported by any authority, it is contradicted by the only authority on point.

## B.     The NSMIA does not preempt Plaintiff's negligence claim.

Contrary to Equitable's contentions, "[t]he primary purpose of NSMIA was to preempt state 'Blue Sky' laws which required issuers to register many securities with state authorities prior to marketing in the state." *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 108 (2d Cir.2001). "By 1996, Congress recognized the redundancy and inefficiencies inherent in such a system and passed NSMIA to preclude states from requiring issuers to register or qualify certain securities with state authorities." *Id*. "To accomplish this objective, the NSMIA precludes states from imposing disclosure requirements on prospectuses, traditional offering documents and sales literature relating to covered securities." *Zuri-Invest AG v. Natwest Finance Inc.*, 177 F. Supp. 2d 189, 192 (S.D.N.Y. 2001). The NSMIA, at 15 U.S.C. § 77r(a), contains three preemption provisions .

Subsection (a)(1) preempts state laws requiring registration or qualification of covered securities offerings. Congress enacted subsections (a)(2) and (a)(3) to prevent an end run around the first preemption provision by states seeking to impose their own registration requirements. Accordingly,

> subsection (a)(2) prevents states from imposing, limiting or prohibiting any condition on the use of any offering or disclosure document relating to a covered security while subsection (a)(3) prohibits state regulating authorities from requiring a securities offering to meet any merit qualifications.

*Zuri-Invest*, 177 F. Supp. 2d at 193. In addition to these express preemption provisions, the NSMIA

"also has a saving clause which permits the states to retain jurisdiction over fraudulent conduct." *Id.*

> Consistent with this section, the securities commission (or any agency or officer performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions with respect to fraud or deceit, or unlawful conduct by a broker or dealer, in connection with securities or securities transactions.

15 U.S.C. § 77r(c)(1). "Thus, states retain the ability to protect investors through application of state

anti-fraud laws." *Zuri-Invest*, 177 F. Supp. 2d at 193.

"Bringing suit for common law fraud in no way interferes with the regulatory mandates of the

NSMIA." *Zuri*-Invest, 177 F. Supp. 2d at 197. Plaintiff does not seek to impose any disclosure

requirements on Equitable and mere disclosure would not protect Plaintiff anyway. Rather, Plaintiff

seeks only to recoup the losses he has sustained as a result of Equitable's negligent exposure of his

investment to market timers. His claim is not preempted.

**C.    Because Equitable's common law duty under state law mirrors its duty under federal law, there is no conflict and Plaintiff's state law negligence claim is not preempted by any federal law.**

Equitable has not shown (nor can it) that any common law duty regarding valuation of securities

would in any way conflict with Equitable's obligations under federal law.  To the extent that Equitable

needs to change its valuation practices in order to comply with its state law duty of reasonable care, the

state law duty simply *mirrors* the federal requirements. According to the SEC, market quotations "with

regard to a foreign security" are not "readily available" within the meaning of SEC regulations if "a

significant event …has occurred after the foreign exchange or market has closed, but before the fund's

[net asset value] calculation." Investment Company Institute, SEC No-Action Letter, 2001 WL 436249,

at *3 (April 30, 2001). According to the SEC, a "significant event" is "an event that will affect the value of a portfolio security." *Id.* When a fund determines that an event that will affect the value of a portfolio security "has occurred since the closing of the foreign exchange or market, but before the fund's [net asset value] calculation, then the closing price for that security would not be considered a 'readily available' market quotation, and the fund must value the security pursuant to a fair pricing methodology." *Id.*

Plaintiff contends that Equitable was negligent for "failing to evaluate on a daily basis price relevant information available to Equitable Life after the close of foreign securities markets" and for "failing to adjust calculation of daily UV's to take into account any changes in value of the foreign securities …." First Amended Complaint ¶ 68(i) & (ii). That claim of negligence based upon a common law duty of reasonable care does not conflict with any federal law.

## Conclusion

For all of the foregoing reasons, Equitable's Motion to Dismiss should be denied.

Respectfully submitted,


KOREIN TILLERY


    s/ George A. Zelcs
George A. Zelcs #3123738
Three First National Plaza
70 West Madison, Suite 660
Chicago, Illinois 60602
Telephone: 312/641-9750
Facsimile:  312/641-9751
E-mail: gzelcs@koreintillery.com

Robert L. King #6209033
701 Market Street, Suite 350
St. Louis, MO 63101
Telephone:  314/621-4002
Facsimile:   314/621-2586
E-mail: king@swedlowking.com

KOREIN TILLERY
Stephen M. Tillery #2834995
701 Market Street, Suite 300
St. Louis, MO 63101
Telephone:  314/241-4844
Facsimile:   314/241-3525
E-mail: stillery@koreintillery.com

**Attorneys for Plaintiff and the Class**

## CERTIFICATE OF SERVICE

The undersigned certifies that service of the aforementioned instrument was made by means of the Notice of Electronic Filing on August 19, 2005, to the following counsel of record:

**Deborah A. Hawkins**
Heyl, Royster et al.
103 West Vandalia Street
P.O. Box 467
Edwardsville, IL 62025
dhawkins@hrva.com

**Margaret J. Schneider**
Mayer, Brown et al.
190 South LaSalle Street
Suite 3900
Chicago, IL 60603-3441
mschneider@mayerbrownrowe.com

**Richard K. Hunsaker**
Heyl, Royster et al.
103 West Vandalia Street
P.O. Box 467
Edwardsville, IL 62025
rhunsaker@hrva.com

**Robert H. Shultz, Jr.**
Heyl, Royster et al.
103 West Vandalia Street
P.O. Box 467
Edwardsville, IL 62025
rshultz@hrva.com

**Michele Odorizzi**
Mayer, Brown et al.
190 South LaSalle Street
Suite 3900
Chicago, IL 60603-3441
modorizzi@mayerbrownrowe.com

_____s/ George A. Zelcs_____
George A. Zelcs